United States District Court
Southern District of Texas
FILED
JUN 13 2000
Michael N. Milby, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | |
|---|---|
| BELINDA CARRILLO,<br>    Plaintiff,<br><br>v.<br><br>TCI CABLEVISION OF TEXAS, INC.<br>d/b/a AT&T CABLE SERVICES,<br>    Defendant. | §<br>§<br>§<br>§<br>§  CIVIL ACTION NO. C-00-37<br>§<br>§<br>§<br>§ |

**BRIEF OF DEFENDANT TCI CABLEVISION OF TEXAS, INC.
IN ADVANCE OF JUNE 14, 2000 HEARING**

In accordance with the Court's May 30, 2000 telephonic request for additional briefing on the issue of subject matter jurisdiction, Defendant TCI Cablevision of Texas, Inc. (TCITI) respectfully submits the following:

## I. General Factual Background

Defendant TCITI provides cable television service in the Corpus Christi, Texas area. For reasons that will become clear further on in this brief, from 12:01 a.m. January 1, 2000 until approximately 4 p.m. on January 4, 2000, TCITI was legally required by federal statutes and regulations to, and therefore did, remove KIII Channel 3, the local ABC-TV network affiliate in Corpus Christi, from its channel line-up. During this brief period of time, subscribers to TCITI's cable service in the affected area received premium channel programming, specifically the HBO Family Channel, in place of KIII, without additional charge.

Plaintiff Belinda Carrillo purports to be a subscriber to TCITI basic cable service. Although TCITI advises its customers through its promotional and cable subscription materials that all programming carried on TCITI's cable system is subject to change at

any time without notice, Plaintiff commenced this suit for breach of contract seeking monetary damages relating to the temporary, federally-mandated non-carriage of KIII.[1]

## II. Status of Settlement Discussions

Although Plaintiff asserts that she adequately represents the interests of a class of subscribers, no motion for class certification has been filed in this Court despite the fact that removal occurred nearly five months ago and despite the passage, two months ago, of the court-ordered deadline for the joinder of parties. As discovery is expected to reveal, Plaintiff's attempted breach of contract claim clearly suffers from a lack of viability, because Plaintiff was informed that TCITI's programming was subject to change without notice and, hence, there was no guarantee that the entire corpus of programming existing at the time of subscription would remain unchanged indefinitely. In short, there was no breach of contract.

Although TCITI intends to defend vigorously against the insinuation of a breach of contract should this case proceed to trial, it has made early and aggressive efforts to reach an out-of-court settlement with the Plaintiff. Even assuming *arguendo* that TCITI's inability to retransmit the KIII signal during January 1-4 amounted to a breach of contract, Plaintiff's actual damages are somewhere on the order of 7¢.[2] Nevertheless, TCITI has offered to settle this lawsuit as presently postured (i.e., a lawsuit in which Plaintiff's claim alone, and not those of any class member, is presented) for $4,750. This

---

[1] TCITI fully expects that discovery will bear these facts out. No citations to formal evidence are included in this briefing, as no formal discovery has occurred apart from TCITI's compliance on March 16, 2000 with its initial disclosure obligations. Plaintiff has never made her Rule 26(a)(1) initial disclosures.

[2] This is based on the following facts: subscribers pay $11.03 monthly ($9.79 plus taxes and franchise fees) for TCITI basic cable service; only one channel, KIII, out of the twenty usually carried as part of the basic service package, was out of service; and that service interruption lasted for 3 ¾ days (pro-rated to 4 days). Again, this analysis is based on the for-the-sake-of-argument assumption that there was a breach, as well as on the assumption that the HBO Family Channel, the premium channel that replaced KIII, was of no value to Plaintiff.

offer was made during these early stages of the proceedings so as to avoid the incurring of any significant discovery costs on either side. Astonishingly, although the figure at which TCITI indicated it is willing to settle *Plaintiff's individual claim* is very near to the amount of actual damages that would be payable *to the entire body of 75,000 or so affected subscribers*,[3] assuming breach, Plaintiff has rejected this offer, demanding thousands more.

### III. Subject Matter Jurisdiction Issues

#### A. Removal

Plaintiff commenced this action on or about January 3, 2000 in the District Court of Nueces County, Texas, 105th Judicial District against "AT&T Corp., Individually and d/b/a AT&T Cable Services f/k/a TCI Cablevision." A First Amended Petition was filed on January 4, 2000 naming the same parties. On January 28, 2000, AT&T Corp. removed the suit to the United States District Court for the Southern District of Texas, Corpus Christi Division on the basis of diversity of citizenship and federal question jurisdiction. On February 4, 2000, AT&T Corp. filed a Motion to Dismiss, arguing in part that the suit should be dismissed because Plaintiff named the incorrect entity as Defendant. On or about March 22, 2000, Plaintiff filed a Motion for Leave to File a Second Amended Complaint,[4] attaching a proposed Second Amended Complaint that deletes AT&T Corp. as a Defendant and names TCITI as Defendant. After three judges recused themselves from this matter, Chief Judge Kazen ordered this case transferred to the present Court. No motion to remand has been filed.[5]

---

[3] As per the formula in footnote 2, *supra*.
[4] No ruling has been received on this Motion. AT&T is unopposed.
[5] Counsel for Plaintiff has expressed to counsel for TCITI the concern that a remand to state court could lead to further delays, as his informal sampling reveals that there could be difficulty locating a state

3

## B. Federal Question Jurisdiction

### 1. The Dispute Between the Parties Is Governed by a Complex Federal Statutory and FCC Regulatory Framework

Rebroadcast of KIII Channel 3 by TCITI is governed by the Cable Communications Policy Act of 1984, as amended by the Cable Television Consumer Protection and Competition Act of 1992 (collectively "the Act"), codified in scattered sections of 47 U.S.C., and by various regulations promulgated by the Federal Communications Commission under the authority of the Act, which are compiled in Title 47 of the Code of Federal Regulations. (For factual support of the assertions in this section, see the Affidavit of Jerome J. Kashinski attached to AT&T Corp.'s February 4, 2000 Motion to Dismiss.)

Title 47 U.S.C. § 534(a) provides, in part, "Each cable operator shall carry, on the cable system of that operator, the signals of local commercial television stations." Cable operators are prohibited, however, by 47 U.S.C. § 325(b)(1) and 47 C.F.R. § 76.64(a) from retransmitting the signal of a commercial broadcasting station such as KIII Channel 3 without first obtaining the "express authority" of that station. 47 U.S.C. § 325(b)(1)(A) ("[N]o cable system or other multichannel video programming distributor shall retransmit the signal of a broadcasting station . . . except with the express authority of the originating station."); 47 C.F.R. § 76.64(a) (providing that, subject to certain restrictions, "no multichannel video programming distributor [defined to include a cable operator] shall retransmit the signal of any commercial broadcasting station without the express authority of the originating station").

---

district court judge in the Corpus Christi area who would not have to recuse himself or herself as a potential class member.

4

Federal regulations further provide, at 47 C.F.R. § 76.64(f), that commercial television stations must make an election between gaining carriage on a cable system by retransmission consent or under "must-carry" status (which is defined in the U.S. Code and the C.F.R. and which obviates the need for a retransmission consent). If a commercial television station such as KIII Channel 3 opts to proceed by retransmission consent agreement, FCC regulations provide, at 47 C.F.R. § 76.64(k), that such retransmission consent agreement between the station and the cable operator "shall be in writing and shall specify the extent of the consent being granted."

Under federal regulations, 47 C.F.R. § 76.64(f)(1,2), commercial television stations are required to make elections between retransmission consent and must-carry status according to the following schedule: the initial election was to be made June 17, 1993, and subsequent elections were to be made at three-year intervals by October 1 of each third year -- in other words, by October 1, 1996, October 1, 1999, and so on. Those elections take effect the following January 1 -- i.e., January 1, 1997, January 1, 2000, and so on.

KIII Channel 3 timely forwarded an election statement by October 1, 1999 indicating its choice to proceed by retransmission consent agreement. However, KIII Channel 3 did not execute a retransmission consent agreement actually authorizing TCITI to carry KIII Channel 3's programming on its cable system until January 4, 2000. Thus, as of January 1, 2000, the date on which KIII Channel 3's election should have taken effect under federal regulations, no written retransmission consent agreement was in place relating to the retransmission by TCITI of KIII Channel 3's programming. As a result, TCITI was prohibited by the statutes and regulations quoted above from

retransmitting KIII Channel 3's programming. KIII Channel 3's failure to timely execute a retransmission consent agreement is the sole cause for the interruption in service. In conclusion, a determination of the merits of Plaintiff's claims necessarily rests on a construction of the Cable Communications Policy Act of 1984, as amended by the Cable Television Consumer Protection and Competition Act of 1992. For this reason, Plaintiff's state law breach of contract claim is preempted.

 2. **The Act Itself and the Historical Construction of Preemption in the Field of Cable Regulation Suggests an Exercise of Jurisdiction Is Within This Court's Discretion**

Apart from the foregoing statutory (and corresponding regulatory) provisions applicable to the specific dispute at issue in this suit, other portions of the Act evidence a clear congressional intent to allow state regulation and state causes of action relating to cable television services to co-exist with the federal regime only to the extent that there is no inconsistency with the federal regime. *See, e.g.*, 47 U.S.C. § 556(a) (regulation by states, political subdivisions, state and local agencies, and franchising authorities allowed only "to the extent consistent with the express provisions of this subchapter"); *see also id.* § 556(b) (states shall exercise jurisdiction with regard to cable services only in a manner "consistent with this subchapter"). Similarly, TCITI contends that a private party's suit under Texas state law for breach of contract premised on TCITI conduct that was federally compelled – i.e., the non-retransmission of KIII – would be inconsistent with Title 47, and hence such a claim is preempted by 47 U.S.C. § 556(c), which provides, "Except as provided in section 557 of this title, any provision of law of any State, political subdivision, or agency thereof, or franchising authority, or any provision of any

franchise granted by such authority, which is inconsistent with this chapter shall be deemed to be preempted and superseded."

The statement of purpose contained in the Act provides further elaboration. The first "purpose" listed in the Act is reflective of Congress' desire to establish, at the national level, a uniform set of policies relating to cable television services. *See* 47 U.S.C. § 521(1) ("The purposes of this subchapter are to – (1) establish a national policy concerning cable communications."). Uniformity of procedures and standards was designed to "encourage the growth and development of cable systems and . . . assure that cable systems are responsive to the needs and interests of the local community." *Id.* § 521(a)(2); *City of Gillette v. TCI Cablevision of Wyo.*, No. 90-CV-1046-J, 1991 U.S. Dist. LEXIS 21734, at *10 (D. Wyo. Nov. 15, 1991) ("In 1984 the United States Congress passed the nation's first comprehensive cable legislation. The Cable Act was designed to establish a national policy concerning cable communications with the goal of minimizing unnecessary regulation of the industry while ensuring that cable systems 'are responsive to the needs and interests of the community.'"); *see also WestMarc Communications, Inc. v. Connecticut Dept. of Pub. Util. Control*, No. H89-631(AHN), 1990 U.S. Dist. LEXIS 20084, at *34 (D. Conn. May 4, 1990). Congress expressed its belief that unnecessary regulation "would impose an undue economic burden on cable systems." 47 U.S.C. § 521(6).

Although the regulation of cable television has thus been subject to a federal/state duality, the arena of state influence and the reach of state laws has always been quite limited. In issues of signal carriage, the role of the state is especially constrained. "The FCC made its first effort to define the boundaries of federal and state regulation in 1972.

7

The FCC attempted to establish a deliberately structured dualism whereby local governments would be responsible for selecting franchises, pursuant to minimum standards established by the Commission, while the Commission retained exclusive authority *over all operational aspects of cable communications, including* technical standards and *signal carriage.*" *Cable Television Ass'n of N.Y., Inc. v. Finneran*, 954 F.2d 91 (2d Cir. 1992) (emphasis added).[6] As support, the *Finneran* court cited to *New York State Comm'n on Cable TV v. FCC*, 749 F.2d 804 (D.C. Cir. 1984), and *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 81 L. Ed. 2d 580, 104 S. Ct. 2694 (1984). In *New York State Comm'n on Cable TV*, the District of Columbia Circuit, 749 F.2d at 806-09, concluded that the FCC acted within its statutory authority in preempting state and local regulation of satellite master antenna television. In *Crisp*, 104 S. Ct. at 2701, the Supreme Court concluded that "pursuant to its delegated authority under the Communications Act, the FCC has unambiguously expressed its intent to pre-empt any state or local regulation of this entire array of signals carried by cable television systems"); *see also id.* at 2702 ("the Commission retained exclusive jurisdiction over all operational aspects of cable communication, including signal carriage and technical standards").

Elsewhere, the FCC has elaborated the essentially federal nature of cable television regulation and management, carving out the narrowly tailored domain of public rights of way as being within local purview:

---

[6] "In short, in the Cable Act Congress attempted to create a comprehensive and reticulated scheme for regulating cable television and to define the relative spheres of authority of the states and the federal government. The Act cut back on federal authority in some places – particularly control of franchising. The Act removed state authority in others – like regulation of rates for the provision of basic service." *Cable Television Ass'n of N.Y.*, 954 F.2d at 98.

8

> The ultimate dividing line, as we see it, rests on the distinction between reasonable regulations regarding the use of the streets and rights-of-way and the regulation of the operational aspects of cable communication. The former is clearly within the jurisdiction of the states and their political subdivisions. The latter, to the degree exercised, is with the jurisdiction of the Commission.

*Duplicative & Excessive Over-Regulation of Cable Television*, 54 F.C.C.2d 855, 861 (1975). "Under this dual regulatory framework, the Commission has consistently retained exclusive authority over those elements of cable television that do not involve the use of public rights-of-way." *New York State Comm'n on Cable Television*, 749 F.2d at 810.

The subject matter of this dispute, in short, falls completely within the realm of what is typically considered to be a field for federal, not state, regulation. Further, the fact that the Act does not provide Plaintiff with a specific cause of action under federal law to address the actions about which she complains in no way means that the state law breach of contract claim should not be deemed barred by the doctrine of preemption. Although far from clear,[7] the doctrine of complete preemption allows for preemption of state law claims even in the absence of a "replacement" federal cause of action. One writer reviewing the state of the law has commented as follows:

> While some circuits have salvaged a coherent doctrine of complete preemption from the Supreme Court's opinions, others have settled upon an overly-simplified understanding of preemption as a basis for removal.

---

[7] Much has been written about the want of clarity in the preemption doctrines as they relate to removal, including the following:
> The Supreme Court first used preemption as a basis for removal almost thirty years ago. Since then, the Court has jumbled the doctrine into confusion in at least five additional cases, allowing it, coupled with the misleading concept of artful pleading, to come dangerously close to nullifying the well-pleaded complaint rule and master-of-the-complaint doctrine altogether. On several occasions, the Court has addressed the complete preemption issue head-on; on others, it has relegated its discussion to footnotes. Whatever the nature of the guidance, however, the substance has been far from clear.

Tristin K. Green, Comment, *Complete Preemption – Removing the Mystery from Removal*, 86 CALIF. L. REV. 363, 371 (1998).

9

There are several possible readings of the Supreme Court's decisions. Under a very narrow reading, Congress must expressly show its intent to allow removal. Under a more moderate reading, complete preemption may exist beyond ERISA and the LMRA, but Congress must indicate its intent to allow removal either expressly or by implication by providing a parallel federal cause of action. Finally, under a broad reading, complete preemption exists whenever federal law is "so powerful" that it completely preempts an "area" of state law, regardless of whether Congress has provided a federal cause of action. Very few, if any, courts follow a very narrow interpretation . . . . Other courts, in contrast, follow a broad interpretation, requiring something more than preemption simpliciter, but not requiring a parallel federal cause of action. Still others have taken the broad interpretation to its extreme by side-stepping the well-pleaded complaint rule altogether and allowing removal upon any showing of federal preemption.[8]

TCITI would request this Court to take a broad view of federal preemption under the facts of this case and the applicable statutory and regulatory scheme, and it urges this Court to conclude that the breach of contract claim asserted herein is preempted. In fact, federal preemption has been found under the Act in several respects, even without any express statement of preemption in the particular field in issue. *See, e.g., Time Warner Cable v. Doyle*, 66 F.3d 867 (7th Cir 1995) (in promulgating regulation under Act, FCC reasonably concluded it was authorized to preempt state consumer protection laws insofar as they conflicted with limited negative option billing allowed in regulation; regulation preempted administrative enforcement action brought by state attorney general before State Department of Agriculture, Trade and Consumer Protection, in which it was alleged that a cable television operator's particular billing practice constituted "negative option billing" prohibited by the state unfair trade practices statute); *Town of Norwood v.*

---

[8] Green, *supra*, at 379-80; *see also id.* at 382 ("While the Supreme Court has only identified two areas of law that are completely preempted by federal statutes, section 301 of the LMRA and section 502(a) of ERISA, some lower courts have extended the doctrine to include other federal laws." (citing *Rosciszewski v. Arete Assocs. Inc.*, 1 F.3d 225 (4th Cir. 1993) (section 301 of the Copyright Act); *M. Nahas & Co. v. First Nat'l Bank of Hot Springs*, 930 F.2d 608 (8th Cir. 1991) (section 86 of the National Bank Act); *Trans World Airlines, Inc. v. Mattox*, 897 F.2d 773 (5th Cir. 1990) (section 105(a)(1) of the Airline Deregulation Act))).

*Adams-Russell Co., Inc.*, 549 N.E.2d 1115 (Mass. 1990) (provision in franchise contract between municipality and competitive cable system that imposed a rate freeze on that system's rates amounted to a regulation that would frustrate the purpose of and was thereby pre-empted by § 543 of the Cable Act, which made such rate-freeze regulations invalid after a certain date); *WestMarc Communications, Inc. v. Connecticut Dept. of Pub. Util. Control*, No. H89-631(AHN), 1990 U.S. Dist. LEXIS 20084, at *37-38 (D. Conn. May 4, 1990) ("The Committee Report demonstrates that Congress considered the historical and equitable arguments in favor of local rate regulation, and rejected them in favor of a uniform federal standard. . . . Thus, to the extent that the [Department of Public Utility Control] Decision is a form of rate of return regulation which has been imposed to enforce the authority of the local franchising body and assure that subscribers pay only reasonable rates, it was the plain intent of the Congress to preempt such regulation.").[9]

Because the actions of which Plaintiff complains are fully governed by a complex federal statutory and regulatory scheme pertaining to the provision of cable television services, this matter should not be remanded.

## C. Diversity of Citizenship Jurisdiction

Although TCITI would argue that diversity of citizenship jurisdiction plainly existed at the time of removal, in the event that the Court grants Plaintiff's Motion for Leave to file a Second Amended Complaint, diversity of citizenship would be defeated. TCITI is unopposed to the Motion for Leave. Hence, no further briefing on this issue is appropriate at this time.

---

[9] It should be noted that one unpublished federal court opinion evaluating facts similar to the facts present in this case concluded that a state law breach of contract action was not preempted by the Act. *See*

11

Respectfully submitted,

AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P.

By: *Thomas M. Bevilacqua*
Paula W. Hinton
Attorney-in-Charge
State Bar No. 09710300
Southern District of Texas No. 6283
Thomas M. Bevilacqua
Of Counsel
State Bar No. 00793342
Southern District of Texas No. 20377
1900 Pennzoil Place-South Tower
711 Louisiana Street
Houston, Texas 77002
(713) 220-5800 Telephone
(713) 236-0822 Telecopier

**ATTORNEYS FOR DEFENDANT
TCI CABLEVISION OF TEXAS, INC.**

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 12th day of June 2000, a true and correct copy of the Brief of Defendant TCI Cablevision of Texas, Inc. in Advance of June 14, 2000 Hearing was sent by facsimile and by certified mail, return receipt requested, to the following counsel of record in this matter:

David T. Burkett
Burkett and Associates
538 S. Tancahua
Corpus Christi, Texas 78401

*Thomas M. Bevilacqua*

---

*Lerigo v. Novato Cable Co.*, No. C 95-0358 SC, 1995 WL 220127 (N.D. Cal. Apr. 7, 1995).

12